David E. Bower, SBN 119546
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 601-2610

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT KROMPHOLD, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CASTLIGHT HEALTH, INC., GIOVANNI M. COLELLA, BRYAN ROBERTS, ANN LAMONT, ED PARK, DAVID B. SINGER, MICHAEL EBERHARD, DAVID EBERSMAN, and KENNY VAN ZANT,<br><br>Defendants. | Civil Action No. 3:17-cv-1081<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>1. **VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br>2. **VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

Plaintiff Robert Kromphold ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action is brought as a class action by Plaintiff on behalf of himself and other similarly situated holders of the common stock of Castlight Health, Inc. ("Castlight" or the "Company") against Castlight and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Castlight, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, Regulation G, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4), in connection with the proposed merger between a wholly owned subsidiary of Castlight and Jiff, Inc. ("Jiff").

2. On January 4, 2017, Castlight entered into an Agreement and Plan of Merger and Reorganization ("Merger Agreement") with Jiff, pursuant to which a wholly owned subsidiary of Castlight will merge with and into Jiff, with Jiff surviving as a wholly owned subsidiary of Castlight (the "Proposed Merger").

3. In connection with the Proposed Merger, Castlight shareholders must vote on whether or not to approve the issuance of approximately 27 million shares and options of Castlight Class B common stock to Jiff equity holders (the "Merger Consideration").

4. Additionally, as part of the Proposed Merger, certain Jiff shareholders and option holders have the right to receive up to 4,000,000 shares of Castlight Class B common stock or options with rights to Castlight Class B common stock, respectively, upon the achievement by the Jiff business of certain milestones in 2017. Specifically, former Jiff share and option holders will receive an aggregate of 1,000,000 shares of Castlight Class B common stock or Castlight options if the Jiff business achieves at least $25 million in revenue in 2017 and an aggregate of 3,000,000 shares of Castlight Class B common stock or Castlight options if the Jiff business achieves at least

$25 million in net new bookings during 2017 (the "Contingent Consideration" or "Earnout"). The Merger Consideration is valued at approximately $135 million.

5.      The Merger Consideration is excessive and meaningfully dilutes Castlight's current shareholders. Indeed, upon the announcement of the Proposed Merger, a Raymond James analyst cut Castlight's investment rating and stated that the Proposed Merger comes at a "hefty price" for Castlight shareholders, with an enterprise value ("EV") to sales multiple at 8x sales and expected 20% dilution.[1] Furthermore, as outlined below, the excessive Merger Consideration is the result of a flawed strategic review process, during which Castlight management and the Board failed to conduct a sufficiently robust review of strategic alternatives and instead focused solely on finalizing the Proposed Merger with Jiff.

6.      On February 2, 2017, in order to convince Castlight shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading joint proxy statement/prospectus/information statement ("Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

7.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the strategic review and negotiation process; (ii) Castlight's and Jiff's financial projections; (iii) the valuation analyses performed by the Company's financial advisor, Allen & Company, LLC ("Allen"); and (iv) potential conflicts of interest Allen faced that may have tainted its fairness opinion.

8.      The special meeting of Castlight shareholders to vote on the Proposed Merger is forthcoming. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so they can properly exercise their corporate suffrage rights.

9.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to

---

[1] Beth Mellor, *Castlight Falls; Raymond James Says Jiff Deal Adds Risk*, BLOOMBERG, January 5, 2017.

**CLASS ACTION COMPLAINT**

enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Castlight shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

11. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Castlight maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

13. Plaintiff is, and at all relevant times has been, a shareholder of Castlight.

14. Defendant Castlight is a Delaware corporation with its principal executive offices located in San Francisco, California. Castlight provides a set of applications and services that enables employers to deliver cost-effective benefits, medical professionals, and health plans. The

Company offers dashboards, reports, and analytics to pinpoint opportunities that eliminate wasteful healthcare spending and poor-quality outcomes.

15.     Individual Defendant Giovanni M. Colella is, and has been at all relevant times, Castlight's Co-Founder and Chief Executive Officer and a Company director.

16.     Individual Defendant Bryan Roberts is, and has been at all relevant times, the Chairman of the Castlight Board.  Mr. Roberts is also a Partner at Venrock, which beneficially owns approximately 16% of Castlight's total issued and outstanding capital stock, and approximately 18% of the total issued and outstanding Jiff capital stock.

17.     Individual Defendant Ann Lamont is, and has been at all relevant times, a Castlight director.  Ms. Lamont is also a Managing Partner at Oak Investment Partners, which owns 21.95% of Castlight's Class A shares and controls 11.47% of voting power.

18.     Individual Defendant Ed Park is, and has been at all relevant times, a Castlight director.

19.     Individual Defendant David B. Singer is, and has been at all relevant times, a Castlight director.  Mr. Singer is also a Managing Director at Maverick Capital, which beneficially owns or controls 14.24% of the Company's Class A shares, 2.41% of the Company's Class B shares, and controls 8.57% of voting power.

20.     Individual Defendant Michael Eberhard is, and has been at all relevant times, a Castlight director.

21.     Individual Defendant David Ebersman is, and has been at all relevant times, a Castlight director.

22.     Individual Defendant Kenny Van Zant is, and has been at all relevant times, a Castlight director.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Castlight (the "Class").  Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of February 21, 2017, there were approximately 51.11 million shares of Castlight common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Castlight will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy, in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

**CLASS ACTION COMPLAINT**

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.      The Merger Consideration is Excessive, Significantly Dilutes Castlight Shareholders, and is the Result of a Flawed Strategic Review Process**

25.      Castlight was founded in 2008 and is headquartered in San Francisco, California. The Company provides cloud-based software in the United States.  Its software products enable employees to make health care decisions, and to communicate and measure their benefit programs. The Company also offers communication and engagement, implementation, and customer support services.  It serves customers in a range of industries, including education, manufacturing, retail, technology, and government.  The Company was formerly known as Ventana Health Services and changed its name to Castlight Health, Inc. in April 2010.

26.      The Merger Consideration is excessive and significantly dilutes Castlight's current shareholders.  Indeed, upon the announcement of the Proposed Merger, a Raymond James analyst cut Castlight's investment rating and stated that the Proposed Merger comes at a "hefty price" for

Castlight shareholders, with an enterprise value ("EV") to sales multiple at 8x sales and expected 20% dilution.

27.     The Merger Consideration is also excessive in light of the Company's recent financial performance.

28.     On August 8, 2016, Castlight announced the following impressive financial results for the second quarter of 2016: Total revenue for the second quarter of 2016 was $23.6 million, an increase of 27% from the second quarter of 2015; subscription revenue was $22.0 million, an increase of 27% on a year-over-year basis; and gross margin for the second quarter of 2016 was 62.1%, compared to a gross margin of 55.4% in the second quarter of 2015.

29.     On November 2, 2016, Castlight announced the following strong financial results for the third quarter of 2016: Total revenue for the third quarter of 2016 was $25.5 million, an increase of 31% from the third quarter of 2015; subscription revenue was $23.9 million, an increase of 31% on a year-over-year basis; and gross margin for the third quarter of 2016 was 68.8%, compared to a gross margin of 55.5% in the third quarter of 2015.

30.     Most recently, on February 15, 2017, Castlight announced the following impressive financial results for its fourth quarter and full year ended December 31, 2016: Total revenue for the fourth quarter of 2016 was $29.9 million, an increase of 40% from the fourth quarter of 2015; subscription revenue was $28.2 million, an increase of 41% on a year-over-year basis; gross margin for the fourth quarter of 2016 was 71.9%, compared to a gross margin of 54.7% in the fourth quarter of 2015; total revenue for 2016 was $101.7 million, an increase of 35% from 2015; subscription revenue was $95.0 million, an increase of 35% on a year-over-year basis; and gross margin for 2016 was 66.0%, compared to a gross margin of 55.2% in 2015.

31.     Commenting on the Company's strong 2016 performance, Individual Defendant Colella stated: "2016 was an important year for Castlight as we executed on key initiatives to drive long-term growth, increase adoption of our full platform, and improve our operating performance. With two-thirds of our new customers in 2016 purchasing the full Castlight platform, we are seeing strong traction with our health benefits platform…"

32.     Based upon these strong financial results, the Company's stock price closed at $5.45 per share as recently as December 23, 2016.  And analysts have issued price targets for the Company at $7.00 per share.

33.     Further, while the Company's stock price declined approximately 15% in January 2017 upon the announcement that its largest customer Wal-Mart Stores Inc. entered into a deal with Workday Inc. for its human resources software, analysts at Raymond James have noted that the stock price drop was "unwarranted."  The Raymond James analyst noted that Walmart's agreement with Workday is unlikely to significantly impact Walmart's relationship with Castlight, as Workday and Castlight offer "vastly different solutions."[2]

34.     Despite the Company's strong stand alone prospects, The Individual Defendants have agreed to the Proposed Merger, which severely dilutes Castlight's current shareholders by offering Jiff's equity holders excessive consideration.  The excessive Merger Consideration is the result of a flawed strategic review and negotiation process, during which the Board and Castlight management failed to conduct a sufficiently robust review of strategic alternatives to the Proposed Merger.

35.     The Board's preference for a transaction with Jiff may have been driven by a significant conflict of interest one of its members faced.  Specifically, Individual Defendant Roberts is a Partner at Venrock, an investment fund that is a significant stockholder of both Castlight and Jiff.

36.     Additionally, the Proxy makes clear that the Board and Castlight management negotiated the Merger Consideration at the same time they were negotiating the potential leadership structure of the combined company.  Ultimately, the parties agreed to appoint Individual Defendant Colella as the Executive Chairman of the Castlight board, and to appoint John C. Doyle, Castlight's current President and Chief Operating Officer, as the Chief Executive Officer of Castlight and a member of the Castlight board upon the completion of the Proposed Merger.

---

[2] Beth Mellor, *Castlight Drop Amid WDAY/WMT Pact 'Unwarranted': Raymond James*, BLOOMBERG, January 12, 2017.

1   Castlight shareholders cannot currently assess how significantly these conflicts of interest

2   permeated the negotiation process however, because Defendants have failed to provide them with

3   sufficient information regarding the evolution of the various Merger Agreement terms that were

4   exchanged between the parties.

5       37.     In sum, the Merger Consideration is unfair to Castlight's current shareholders and

6   is the result of a flawed strategic review process.  It is therefore imperative that they receive the

7   material information that has been omitted from the Proxy sufficiently in advance of the

8   forthcoming shareholder vote, so that they can make a fully informed decision concerning whether

9   or not to approve the Proposed Merger.

10      **II.     The Materially Incomplete and Misleading Proxy**

11      38.     On February 2, 2017, Defendants caused the Proxy to be filed with the SEC in

12  connection with the Proposed Merger.   The Proxy has therefore been disseminated to the

13  Company's shareholders, and solicits the Company's shareholders to vote in favor of the Proposed

14  Merger.  The Individual Defendants were obligated to carefully review the Proxy before it was

15  filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain

16  any material misrepresentations or omissions.   However, the Proxy misrepresents and/or omits

17  material information that is necessary for the Company's shareholders to make an informed

18  decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a)

19  and 20(a) of the Exchange Act.

20      39.     First, the Proxy fails to provide material information concerning the Company's

21  and Jiff's financial projections.  Specifically, the Proxy provides projections for various non-

22  GAAP (generally accepted accounting principles) metrics including Non-GAAP Operating Loss,

23  Non-GAAP EBITDA, and Gross Margin, but fails to provide either the line item projections for

24  the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP

25  projections to the most comparable GAAP measures (*see* Proxy at 76).   The omission of such

26  projections renders the non-GAAP projections included in the Proxy materially incomplete and

27  therefore misleading.

28

**CLASS ACTION COMPLAINT**

40.     When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

41.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Defendants have included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[3]

---

[3] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosures to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability*, (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

**CLASS ACTION COMPLAINT**

42.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[4]

43.     Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[5]   One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

44.     In order to make the projections included on page 76 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.  Indeed, the Company routinely provides such reconciliation tables in its quarterly financial results releases, and it can therefore undoubtedly provide such a reconciliation table for the projections included in the Proxy without unreasonable efforts.

45.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures included in the Proxy (*i.e.*, GAAP operating loss, estimated effects of stock-based compensation, charges related to reduction in workforce, litigation settlement, acquisition costs and amortization of internal use software).  Such projections are necessary to make the non-GAAP EBITDA projections included in the Proxy

---

[4] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/.

[5] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

**CLASS ACTION COMPLAINT**

not misleading.  Simply put, if Defendants are going to use "fantasy math" in the Proxy, they must at the very least show their work.[6]

46.     Defendants have received and have access to the same projections for Jiff (*i.e.* net loss, adjusted to exclude the estimated effects of depreciation and amortization, interest income (expense), net, provision for income taxes and stock-based compensation), and they must disclose them in order to make the Jiff non-GAAP EBITDA projections included on page 76 of the Proxy complete and not misleading.

47.     Furthermore, the Proxy notes that the "Castlight-Jiff Management Forecasts" included in the Proxy were calculated by Castlight management making certain "adjustments" to Jiff's projections as "prepared by Jiff management."  Proxy at 76.  However, the Proxy fails to disclose the unadjusted, pure Jiff management projections, or explain how exactly Castlight's management "adjusted" the Jiff management projections.  Jiff management's pure, unadulterated projections are clearly material to Castlight's shareholders, as they are being asked to vote on whether or not to approve the Proposed Merger and have their equity stake significantly diluted in the combined post-close company.  Such projections are particularly material to Castlight shareholders here, because a significant portion of the overall consideration Jiff equity holders stand to receive is tied to Jiff's new bookings and revenues in 2017.  While Castlight management instructed its banker to assume "that the conditions set forth in the merger agreement with respect to earnout payments would not be satisfied and, accordingly, that no portion of such earnout payments would be made," Proxy at 69, Castlight's shareholders will be even further diluted if Jiff does in fact satisfy the conditions for the earnout payments, and they therefore undoubtedly would find Jiff's pure, unadjusted projections to be material.  The omission of such projections renders the "adjusted" Jiff projections contained on page 76 misleading, as those projections do not

---

[6] Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr.             22,             2016,             http://www.nytimes.com/ 2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

**CLASS ACTION COMPLAINT**

represent Jiff management's projections for Jiff, but rather, Castlight management's various unexplained "adjustments."

48.     Defendants have also failed to disclose the "pro forma financial projections of the combined business," which were specifically reviewed by the Castlight Board (Proxy at 61) and relied upon by Allen in connection with its fairness opinion (Proxy at 68).  The pro forma forecasts are clearly material to Castlight's shareholders, as they are being asked to vote on a Proposed Merger that will severely dilute their equity in the post-close combined business, and the expected performance of the combined business is therefore of the utmost importance to them.  The omission of such projections renders the projections included on page 76 of the Proxy incomplete and misleading.

49.     Additionally, the Proxy notes that, in rendering its fairness opinion, Allen relied upon the standalone unlevered, after-tax free cash flows that Jiff was forecasted to generate during the fiscal years ending December 31, 2017 through December 31, 2019, but the cash flow projections are not disclosed in the Proxy.  Proxy at 73.  Investors are concerned, perhaps above all else, with the future cash flows of the companies in which they invest.  Under sound corporate finance theory, the value of stock should be premised on the expected future cash flows of the corporation; accordingly, the question that Castlight shareholders need to assess in determining whether to vote for the Proposed Merger is clear: is the Merger Consideration being offered now fair or excessive in light of the free cash flows that Jiff is expected to generate?  Without these unlevered free cash flow projections, Castlight shareholders will be unable to answer this question and assess the fairness of the Merger Consideration.  The omission of such projections render the description of Allen's Discounted Cash Flow Analysis and the Jiff projections included in the Proxy materially incomplete and misleading.

50.     Indeed, financial experts agree that projections for Non-GAAP EBITDA, which are included in the Proxy here, are not a sufficient substitute for cash flow projections when attempting to understand the value of a company.  As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest,

taxes, depreciation and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[7]

51.     Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs which are critical to understanding a company's value.  As a result of these material differences between EBITDA and unlevered free cash flow, many analysts recognize unlevered free cash flow as a much more accurate measure when it comes to analyzing the expected performance of a company.  Disclosing EBITDA projections without cash flow projections is therefore inherently misleading.

52.     If corporate directors and officers choose to disclose financial projections in a proxy statement, they must provide complete and accurate projections, not merely excerpts of certain sets or line items of projections.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known--but it may not choose half-truths.

53.     Furthermore, while Defendants have touted the expected synergies from the Proposed Merger as a primary reason why Castlight shareholders should vote in favor of the transaction (*e.g.* Proxy at iv, 63), they have failed to *quantify* the synergies and cost savings expected to result from the Proposed Merger.  The *specific amount of synergies* Defendants expect the Proposed Merger to result in is clearly material information to Castlight's shareholders, and the omission of such information from the Proxy renders the vague reference to the expected synergies touted on page 63 of the Proxy as a factor supporting the fairness of the transaction incomplete and misleading.

54.     Additionally, while the Proxy notes that on October 17, 2016, representatives from Castlight and Jiff met with "a key Castlight customer…to discuss Castlight's relationship with

---

[7]  Elizabeth MacDonald, *The Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

such key customer and a potential combined offering from Jiff and Castlight," Proxy at 59, the Proxy fails to provide any information regarding how the key customer responded to such a combined offering, including whether or not the key customer expressed either support for or opposition to the Proposed Merger.  Such information is clearly material to Castlight shareholders, as a significant portion of Castlight's revenues come from a limited number of customers, the loss of which would have a significant adverse effect on its financial results.  While Defendants warn of this fact in the Proxy, they have failed to provide Castlight shareholders with material information necessary for shareholders to assess the potential for such loss as a result of the Proposed Merger.  The omission of details concerning the reaction by Castlight's "key customer" to the Proposed Merger renders the vague reference to the meeting with said customer on page 59 of the Proxy incomplete and misleading.

55.     The Proxy also fails to provide sufficient information regarding the *specific terms* contained in the various "term sheets" exchanged between Castlight and Jiff.  The Proxy notes that the parties exchanged various "term sheets" between October 14, 2016 and November 28, 2016, but fails to provide any information about the actual terms contained in the term sheets.  Such information is material to Castlight shareholders, as it is necessary for them to properly assess whether there was any meaningful negotiation regarding the material terms of the Proposed Merger, and whether the Castlight Board effectively negotiated on their behalf to minimize the dilution of their equity interest in the combined company.  The specific terms that were proposed throughout the negotiation process are particularly material because Defendants were negotiating the "potential leadership structure of a combined company" at the same time they were negotiating the Merger Consideration.   Proxy at 58.  Shareholders need to know the terms contained in the term sheets to assess whether the Board and management placed their personal interests ahead of those of Castlight's public shareholders in negotiating the terms of the Proposed Merger.  The omission of these details render the vague references to the various term sheets on pages 58-60 of the Proxy incomplete and misleading.

56.     Further, Allen only provided a fairness opinion that the "aggregate base consideration of 27,000,000 shares of Castlight Class B common stock" is "fair, from a financial point of view."  Allen did not opine on the fairness of the Contingent Consideration.  The terms of the terms sheets are thus even more material, as such information will allow Castlight shareholders to assess how the specific terms of the Contingent Consideration were arrived at, and whether there was any meaningful negotiation regarding the amount of the Contingent Consideration.  Indeed, it is currently unclear to Castlight shareholders how the Board arrived at the precise value of the Contingent Consideration provided for in the Merger Agreement and determined the value of the Contingent Consideration was appropriate.  Shareholders actually have no idea whether the Contingent Consideration is actually fair to them and the Company.

57.     With respect to Allen's Selected Public Companies and Selected Precedent Transactions Analyses (Proxy at 71-73), the Proxy fails to disclose the individual multiples Allen calculated for each of the companies and transactions used in these analyses.  A fair summary requires the disclosure of the individual multiples for each company and transaction utilized.  Merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.  The omission of the individual multiples renders the summary of these analyses and the implied values calculated in connection therewith materially incomplete and misleading.

58.     The Proxy also fails to provide sufficient information for shareholders to assess certain conflicts of interest Allen faced.  Specifically, while the Proxy notes that Allen "in the past has provided…investment banking services to Castlight" for which services Allen has received compensation, Proxy at 74, Defendants have failed to disclose *the amount* of compensation Allen has received for such services.  Such information is specifically required by SEC Regulations (17 C.F.R. § 229.1015(b)(4)) and is material to Castlight shareholders.  The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that spans more than one transaction.  Where

**CLASS ACTION COMPLAINT**

an investment bank is providing a fairness opinion for long-standing clients, it may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction, as this will ensure future lucrative business.[8]

59.     It is imperative for shareholders to be able to understand what factors might influence a financial advisor's analytical efforts.  A financial advisor's own interests in a Proposed Merger must be carefully considered in assessing how much credence to give its analysis.

60.     Lastly, the Proxy states five times that "the Castlight Board appointed a Special Committee (comprise *solely* of disinterested directors)" to evaluate, assess, and approve the Proposed Merger (Proxy at 9, 38, 76, 109, 173); however, this statement is misleading, because Individual Defendant Colella was on the Special Committee, and he has interests that are "different from" Castlight's public shareholders.  Specifically, Mr. Colella will become the Executive Chairman of Castlight upon the completion of the Proposed Merger.  Mr. Colella was therefore not truly a "disinterested" director, and Defendants must delete or clarify the statements that the Special Committee was comprised "solely of disinterested directors" in order to make such statements not misleading.

61.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4) Promulgated Thereunder)**

62.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

---

[8] Steven M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1587 (2006).

**CLASS ACTION COMPLAINT**

63.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

64.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

65.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

66.     SEC Regulation 17 C.F.R. § 229.1015(b)(4) requires disclosure of all relationships between a company and its financial advisor and the compensation received by the advisor for the last two years.

67.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

68.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.   Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things:(i) the strategic review and negotiation process; (ii) Castlight's and Jiff's financial projections; (iii) the valuation analyses performed by Allen; and (iv) potential conflicts of interest Allen faced that may have impacted its fairness opinion.

69.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.   Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).   The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

70.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.  The Individual Defendants were privy to and had knowledge of the projections for the Company and Jiff and the details concerning the sales process and Allen's prior engagements and valuation analyses.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions.

71.     The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual

Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections and review of Jiff's projections.

72.     Castlight is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

73.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of Castlight within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Castlight, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

**CLASS ACTION COMPLAINT**

76.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

78.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

79.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

80.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC rules promulgated thereunder by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

81.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**CLASS ACTION COMPLAINT**

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED: March 1, 2017

Respectfully submitted,

*/s/ David E. Bower*
   David E. Bower SBN 119546
   **MONTEVERDE & ASSOCIATES PC**
    600 Corporate Pointe, Suite 1170
   Culver City, CA 90230
   Tel: (310) 446-6652
   Fax: (212) 601-2610
   Email:  dbower@monteverdelaw.com

*Counsel for Plaintiff*

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*

**CLASS ACTION COMPLAINT**